IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

GABRIEL M. COKER,           *
                                    *
                Plaintiff,          *
vs.                             *     No. 4:11-cv-00867-SWW
                                    *
                                    *
ARKANSAS STATE POLICE and  *
BRAD CARTWRIGHT, in His Individual  *
and Official Capacity as a State Trooper  *
for the Arkansas State Police,    *
                                    *
                Defendants.     *

<u>OPINION AND ORDER</u>

Gabriel M. Coker brings this 42 U.S.C. § 1983 action against the Arkansas State

Police (ASP) and Brad Cartwright, a Trooper with the ASP, alleging that Trooper

Cartwright used excessive force in arresting him.  The matter is before the Court on

motion of Defendants for summary judgment [doc.#29].  Coker has responded in

opposition to Defendants' motion and Defendants have filed a reply to Coker's response.

Also before the Court is a motion of Coker to compel discovery [doc.#35] to which

Defendants have responded in opposition.  For the reasons that follow, the Court grants

Defendants' motion for summary judgment and denies Coker's motion to compel

discovery as moot.

I.

At approximately 2:30 a.m. on February 12, 2009, Coker was riding his

motorcycle at a very high rate of speed on Arkansas Highway 67/167 North.  Trooper

Cartwright was monitoring the traffic in the area at the time when Coker sped past his observation post.  Coker's motorcycle did not have any identifying tags.  After clocking the motorcycle at 102 mph, Trooper Cartwright activated the flashing blue lights and siren on his patrol car and began to pursue Coker.  At one point during the pursuit, Trooper Cartwright clocked the motorcycle's speed at 152 mph.  When asked during his deposition the probable top speed he "got up to" Coker responded, "One fifty, I imagine."

A video of the pursuit taken from Trooper Cartwright's patrol shows that Trooper Cartwright, with his flashing blue lights and siren on, pursued Coker for some three minutes, twice pulling alongside Coker, but Coker would not stop.  The blue lights were reflecting around Coker, including off highway signs, as Coker sped down the highway.  After passing several vehicles at a high rate of speed, Coker eventually slowed down and pulled over to the left shoulder of the highway as though he were giving up.  Coker, however, again sped up and traveled a short distance on or near the shoulder of the highway but then slowed down again.  Coker appeared as though he were going to speed up yet again but he instead proceeded onto the median of the highway in an apparent attempt to cross to the opposite highway, the traffic of which traveled in the opposite direction from the highway he just exited.  At this point, Trooper Cartwright, at a very low speed, bumped the rear tire of Coker's motorcycle with his patrol car, but Coker did not completely lose control of his motorcycle.  Coker then proceeded through the median and across the opposite highway.  After Coker crossed the opposite highway and onto an on-ramp to the highway appearing to go the wrong way, Trooper Cartwright again

bumped at a very low speed the rear tire of Coker's motorcycle with his patrol car, this time causing Coker to lose control of his motorcycle and fall to the ground in a grassy area.  Coker immediately jumped up and ran out of view of the camera in a clear attempt to flee.  Off camera, Trooper Cartwright, in coarse language, can be heard yelling at Coker to get on the ground and there was obviously a struggle of some sort as evidenced by yelling and screaming, including Trooper Cartwright yelling three times at Coker to put his hands behind his back and, subsequently, yelling at Coker to "give me your right [or "other"] hand!"  Trooper Cartwright apparently succeeded in cuffing Coker after which Coker can be heard apologizing.  Trooper Cartwright ordered Coker to "get [his] ass up."  There is a brief pause and then Coker, in a soft voice, mutters something, perhaps another apology (although it is largely unintelligible).  There is then an unidentified sound (which Coker claims is the sound of Trooper Cartwright striking him after he was cuffed and is described by ASP investigator Corporal Paulette Ward as a "thump") immediately followed by Trooper Cartwright again ordering Coker, in a louder voice, to "get up!"  There is a pause of approximately six or seven seconds and then Coker, in a pleading voice, says, "Please, please don't hit me again.  Sir, I did not know you were behind me."  Trooper Cartwright summoned an ambulance and can later be heard saying, "You're not going to run from us again, are you?"[1]

---

[1] When asked during his deposition why he made that comment, Trooper Cartwright answered, "Because he didn't think we were going to catch him or run from him or chase him.  It was an ill-advised thing to say."

Having set forth the Court's understanding of what the video of Coker's pursuit and arrest reveals, the Court now sets forth the parties' version of the facts. Defendants first state that despite the flashing blue rights and siren, Coker did not stop or slow down. Coker denies this, stating in his deposition that

> [a]t that point, I mean, I was just – I was flying and this car was running with me. I mean, I didn't know what was up until about Ace Liquor Store, which is a quarter mile, half mile, before the [exit], and I slowed down to like 120 or 125 where I could sit up on the bike a little bit because I wanted to see what kind of car it was that I couldn't get away from. And when I – when my vision seen the trees, I seen the blue lights flashing on the trees, and that's when I realized it was a cop behind me and not a car.

Defendants state that on a least two occasions during the pursuit, Trooper Cartwright pulled alongside Coker so that he would be aware that a police officer was attempting to pull him over. Coker admits this but adds that he

> slowed – I mean, I slowed down. I just let off the gas. I was trying to – I remember trying to figure out how I was going to stop, because the first thing that went into my mind was this is a cop that now thinks I was running from him and he's pissed. And I remember thinking, "All right. I'll just stop in the middle." I looked and I knew there wasn't going to be no cars with him, but I looked in front of me and there wasn't no traffic and I said, "I can just stop in the middle of the freeway, kick my kick stand down and fall off the bike." I knew he was mad and I didn't know how to stop.

Defendants state that Coker looked at the police car with its blue lights flashing and sped up. Coker states this is "[n]ot exactly true" in that he

> remember[s] slowing down and I looked in – and I had to move around to look in that mirror. When I looked in that mirror, I seen him charging up. And that's when I sped up and went in the median. I really freaked out then when I seen that. I didn't know what he was doing. I didn't know what was on his mind. I mean, I was really scared. And I was going to lay my bike down and kick it away from me and hope that he ran over the bike. You

know what I am saying? That was just – I thought he was trying to hit me
then.  And before I could lay the bike down, he hit it in which time he
knocked me into oncoming traffic on the other side of the freeway.[2]

Defendants state that Coker traveled at high rates of speed for approximately 3 and

½ minutes and seven miles after Trooper Cartwright first activated his blue lights and

siren.  They state that Coker then slowed down and crossed the median between the

northbound and southbound lanes and traveled briefly in the southbound lane while

heading north.  Coker admits all this but adds that

I didn't want to come off the bike on the asphalt. I wasn't thinking that I
had five layers of clothes on or none of that. I just – I just knew I didn't
want my –  I didn't want to touch the asphalt. So I was just trying to make it
off the asphalt on the other side of the freeway across the other on ramp. I
just wanted to make it off the asphalt and in the grass where I could jump
off. And before I could do that, it lit up all around me again, and then I
knew he was going to hit me again. And, about the time he hit me, I jumped
off.

Trooper Cartwright states that when he first entered the median following Coker,

he could feel his tires slide on the wet grassy surface and that once he felt himself sliding,

he pressed the accelerator to avoid getting stuck and had a low impact, low speed

collision with the rear tire of Coker's motorcycle.  Defendants state that after Coker

crossed the opposite highway it appeared as though he was going to travel the wrong way

up the on-ramp and that Trooper Cartwright, this time intentionally, again bumped the

rear tire of Coker's motorcycle at a very low speed when it entered the second median.

---

[2] The video does not reveal any oncoming traffic at this point.

After this bump by Trooper Cartwright, Coker fell off the motorcycle and immediately

jumped up and began running away.  Coker denies this, stating that

> [w]hen I jumped off, we were still going – I don't know. I just have to guess
> – like 30, or maybe 30, 35, miles per hour.  Well, when we did, I rolled one
> time.  I remember, it seems like, trying to touch the ground, but, when I
> rolled and stood up, my momentum made it where – I mean, I couldn't
> touch the ground. I tried like three different steps to touch the ground and it
> felt like I wasn't touching the ground. Well, then when I did touch the
> ground and got my feet under me, and when I realized I wasn't going to
> fall, I threw my arms in the air and started screaming, "Please don't kill me.
> Please don't shoot me.  I'm sorry. I didn't know that you were a state
> trooper. I'm sorry. I'm sorry."

The video of the incident belies at least some of Coker's assertions.  First, Coker

fell off his motorcycle–he did not jump–and he was not going anywhere near 30 or 35

mph.  Trooper Cartwright and Coker were going at a very low speed–certainly no more

than 10 or 15 mph–at the time of the second bump and Coker immediately jumped up

after falling off the motorcycle and ran out of view of the camera; there was no delay in

getting his feet under him.  In addition, Coker claims that he didn't know he was being

pursued by law enforcement but he also admits that during the pursuit, Trooper

Cartwright pulled alongside him so that he would be aware that a police officer was

attempting to pull him over and that he was "trying to figure out how I was going to stop,

because the first thing that went into my mind was this is a cop that now thinks I was

running from him and he's pissed."  He also earlier stated that in response to a question

about how fast he was going that he "didn't know what [the car behind him] was doing,"

and that "I'm guessing that's when the chase started.  That's when – because I'm

assuming that that was a state trooper that was the car behind me that I thought I might

have cut off.  So, I mean, I didn't – I didn't know."

Defendants state that after Coker fell of his motorcycle and began running,

Trooper Cartwright pursued Coker on foot and shouted for Coker to stop and get on the

ground.  Defendants state that Coker turned and took up an aggressive fighting stance

against Trooper Cartwright instead of submitting to arrest and that Trooper Cartwright did

not know whether Coker was carrying a weapon on his person.  Defendants state that as

Coker did not appear to have a weapon drawn at that time Trooper Cartwright

administered a front kick to Coker's face which put Coker on his back on the ground.

Coker denies this version of the events, stating that he

> started to turn a circle – I couldn't figure out why I couldn't see.  I started to
> turn a circle and my shield was fogged up or there was mud on it or
> something.  Well, I was scared.  I remember, I was scared to pull my hands
> down to grab my chinstrap and throw my helmet off, but I knew I had to
> because I didn't know where I – I didn't know where he was compared to
> me or what, so I threw my helmet off and I kept turning a circle.  And I just
> remember when I threw my helmet off, I was scared he was going to shoot
> me.  I was just scared to death.  And I seen his flashlight. And when I seen
> his flashlight, I kept turning until my back was to him, and I said, "What do
> you want me to do?" And he said, "Get on the ground." And I laid down on
> the ground pushing my hands away from my head the whole time until I
> laid down.  And then, even when I laid down, I was pushing my hands away
> from my head.  And I was just listening and I heard his footsteps coming.
> And then he got closer and closer and I closed my eyes when I knew that he
> was close.  And I was pushing my hands away from me. And I remember
> him – I don't know.  I just remember – I didn't really feel pain from it, but I
> knew what happened when he kicked the side of my head and my head
> bounced up and I put this side of my face down on the ground.  I mean, I
> was just kind of – emotionally, I kind of freaked out on the inside.  But, I
> mean, at this point, I was still pushing my hands away from my head.  I was
> scared.

Defendants state that it was very dark and Coker was wearing a thick jacket with a fanny pack across the chest.  Coker denies it was very dark, pointing to Trooper Cartwright's answer to the following question:

> Q.  If there was no light and you couldn't see Mr. Coker, would there be a reason for you to put your pistol back in your holster?
>
> A. I didn't say there was no light. There's very low light.  And I don't know if you know the difference.  But you can see objects.  You can't pinpoint objects.  I don't know where – I know the direction he ran.  It was perpendicular to the way my flash – I mean, my headlights are shining.  But its very minimal light.  I can't – I can't recall if I have the flashlight on or off.

Coker additionally notes that the video of the incident indicates the headlight from the motorcycle was pointed in the direction of the encounter between himself and Trooper Cartwright and that Trooper Cartwright's flashlight was illuminated.  Regardless, it is clear from the video that there was only low or dim light.

Defendants state that after Trooper Cartwright administered the front kick to Coker's face which put Coker on his back on the ground, Coker continued resisting arrest and that Trooper Cartwright sat on Coker and attempted to secure his arms.  Defendants state that while on the ground, Trooper Cartwright struck Coker one time in the face and Coker submitted to arrest.  Trooper Cartwright states that he was holding his "Maglite" flashlight during the foot pursuit and that he was unsure when he put it in his pocket.  In his declaration, Trooper Cartwright states that while he cannot say for certain that he had the flashlight in his hand when he struck Coker, he acknowledges that "it is very possible that I did and very possible that the flashlight struck him."

Defendants state that after submitting to arrest, Trooper Cartwright was able to roll Coker onto his stomach and place him in handcuffs.  Coker disputes defendants' version of the arrest, stating that he said to Trooper Cartwright,

> "What do you want me to do?" And he said, "Put your hands behind your back." So I – my right arm, as soon as I got it turned a little bit, he grabbed a hold of it and he put a handcuff on it and torqued on it some and then put it on my back and it seems like he put his knee on top of that on my back. And, when I turned, my arm – like, I had it like this. When I turned my wrist like this to start going behind my back, I realized that I wouldn't be able – from laying down flat on the ground, I wasn't going to be able to just turn my hand and go behind my back.  And I got it ready to where I could just roll a little bit to my right and then I could get my arm behind my back. And when I did, I looked out the corner of my eye, it's crazy, but I seen his red hair and his freckles and I seen a flash, then I heard the batteries hit the side of the MAG light and then I heard the bones in my face break.  And I remember popping my head back over again, like this with my arm behind my back to try and keep this side of my face from getting hit.

Trooper Cartwright cuffed Coker and pulled him to his feet and Coker claims that Trooper Cartwright struck him again.  Around this time, other law enforcement personnel began arriving on the scene and Coker states they patted him down and

> started unzipping layers of clothes and they got the one jacket off and they got the Carhartt jacket off. And the Carhartt jacket, when they took it off, I looked down and I seen my backpack and I remembered that I had the marijuana in there.  I had on the [NASCAR] Mountain Dew jacket and then a Carhartt jacket and then a backpack for motorcycles.  It's like a half of a backpack, and then I had it on.  But it was florescent green. But it was under two layers of clothes.

Another officer accompanied Coker to the hospital for treatment and Trooper Cartwright arrived at the hospital later to take custody of Coker.  Coker states in his complaint that "[a] CT scan of his facial bones showed evidence of fractures involving

the left maxillary antrum.  Evidence for fractures involving the lateral, medial, and anterior wall of the left maxillary sinus, also evidence for fracture involving the anterior/inferior corner of the left orbit and also evidence of a left maxillary sinus hematoma.  Evidence of mildly displaced fracture involving left zygomatic arch."

Coker was charged with various crimes, including felony fleeing, possession of marijuana, resisting arrest, and assault.  Coker pled guilty to, *inter alia*, felony possession of marijuana and felony fleeing, and he was sentenced to 10 days confinement (suspended), five years probation, 40 hours of community service, and a fine and court costs.[3]

Following his arrest of Coker, Trooper Cartwright completed an ASP Use of Force Report form.  In the narrative portion of his Use of Force Report, Trooper Cartwright, after recounting how he first unintentionally bumped the rear tire of Coker's motorcycle, states as follows:

> Coker then attempted to accelerate again into the US 67 southbound lanes, still traveling northbound.  Due to his reckless and high speed driving displayed throughout this incident, I felt that if Coker was able to continue northbound in the southbound lanes, his safety as well as the danger of death or serious injury of other un-expecting motorists, who would be traveling in the opposite direction was too great for him to continue.  At a very low speed, I bumped [Coker's] rear tire with the front left corner of my bumper.  This action caused [the motorcycle] to lie on its left side and Coker fell off [the motorcycle] into a prone position.  This action occurred on the on-ramp to US 67 South from SH 5.

---

[3] Coker is currently serving a 24-month sentence in the Bureau of Prisons, having pled guilty before another judge to a federal charge of felon in possession of a firearm.  See *United States v. Coker*, No. 4:12cr00003-BRW (E.D. Ark.).

Coker immediately jumped to his feet and began running westbound.  I exited my patrol car and gave several clear and loud verbal commands for him to get on the ground as I ran after him.  Each command was ignored.  I also could tell that Coker was wearing bulky winter clothing.  This made it impossible for me to tell whether or not he was armed.

In the grassy area located in between US 67 South and the West frontage road Coker suddenly stopped running.  This area had no artificial light.  My headlights were not illuminating the direction where Coker ran.  This made for minimal visibility.

As Coker stopped running he turned facing me.  I continued to give verbal commands to no avail.  Coker took an aggressive stance as he crouched into a "fighting" position.  Both feet were wider than shoulder width apart and he crouched (bent at the knees in what I would call an athletic/fighting stance) in such a manner as if he was preparing for my approach.  Both arms were in an offensive posture as he held his hands out in front of his face (a position commonly used by boxers/fighters).  I continued running and I performed a front kick knocking him backwards onto his back.

Coker displayed more signs of aggression while on his back by taking a "ground fighting" position.  He did so by putting his hands up as if to grab or strike me.  His feet and legs were up in the air as if he was going to kick.

After the initial foot strike and after Coker went to the ground, I moved in an attempt to affect the arrest.  Several blows were exchanged with Coker trying to get me away/off and escape.  I had to forcibly put Coker on his stomach as he resisted.  I gave loud verbal commands for him to place his hands behind his back to no avail.  I grabbed his left hand placing it behind his back before placing into handcuffs.  More verbal commands were given for Coker to place his right hand behind his back.  Coker continued to wrestle trying to free himself.  I was able to grab the right hand and with force, place it behind his back and secure it into handcuffs.  The handcuffs were double locked and Coker was taken into custody without further incident.

In his Use of Force Report, Trooper Cartwright did not refer to a flashlight in his

narrative of the application of force in arresting Coker and he did not check the box

indicating that a flashlight was used in his application of force.  Trooper Cartwright did,

however, check the box indicating he struck Coker with a blow.[4]

ASP Corporal Paulette Ward states that on August 18, 2009, she received a letter

from Coker requesting that Internal Affairs review the video of his arrest.  She states she

provided Coker a Complaint Form that Coker would have to complete if he wanted to file

a formal complaint.  Corporal Ward states she subsequently received a completed

Complaint Form from Coker and an investigation was initiated.

On October 20, 2009, Sergeant Charlie Beall, an ASP Internal Affairs Investigator,

interviewed Trooper Cartwright regarding the use of force against Coker.  The nearly

hour-long interview was somewhat combative and Sergeant Beall was troubled with

Trooper Cartwright's failure to mention the flashlight in his Use of Force Report, stating

that it "didn't smell good," that he gave the "appearance of being a cover-up artist," and

that he was "playing word games."  Sergeant Beall simply did not buy Trooper

Cartwright's claim that he didn't remember hitting Coker with his flashlight and

questioned Trooper Cartwright's denial of hitting Coker while handcuffed.  Sergeant

Beall additionally questioned Trooper Cartwright's "unusual amount" of Use of Force

Reports, asking Trooper Cartwright whether he had "anger management problems," and

he expressed concern about the legal liability the ASP might face from Coker as a result

---

[4] Trooper Cartwright also completed an ASP Pursuit Report form in which he incorporates the narrative set out in his Use of Force Report.  In his Pursuit Report, Trooper Cartwright checks, *inter alia*, the "accident" box and the "Forcible Stop Technique Used" box in setting forth the reason for which the pursuit ended.

of Trooper Cartwright submitting an inaccurate Use of Force Report.  Sergeant Beall also

warned Trooper Cartwright that he would be subjected to a polygraph examination.

Trooper Cartwright, however, did not consider his Use of Force Report to be inaccurate,

and despite Sergeant Beall's dogged insistence that he come clean about hitting Coker

with his flashlight, Trooper Cartwright was steadfast in maintaining that he couldn't state

with 100% certainty that he hit Coker with his flashlight (although he acknowledged he

may have done so  or probably did so) and that he didn't hit Coker while he was

handcuffed.  Trooper Cartwright stated that he wasn't going to include matters in his Use

of Force Report that he couldn't state with certainty occurred and he told Sergeant Beall

that he was ready to take a polygraph examination.  When asked how Coker could have

incurred such expensive medical bills (nearly $6,000), Trooper Cartwright replied that

Coker should not have fought him.  Trooper Cartwright went on to say that he wouldn't

change anything he did in regard to his arrest of Coker.

Corporal Ward states that on October 27, 2009, she administered a polygraph

examination to Coker in which she asked him "Did you lie about that Trooper hitting you

after you was handcuffed?" and "Are you lying about being hit by that Trooper after

being handcuffed?"  Coker answered both questions "No."  Corporal Ward states that

"[t]he physiological responses noted on Mr. Coker's polygraph charts are in such a

pattern as to indicate an inconclusive result" in answering the questions.

Corporal Ward states that on November 10, 2009, she administered a polygraph

examination to Trooper Cartwright in which she asked him "Did you hit Coker after he

was handcuffed?" and "While Coker was handcuffed, did you hit him?"  Trooper

Cartwright answered both questions "No."  Corporal Ward states that the result of the

polygraph examination indicated deception with respect to Trooper Cartwright's answers

to the questions and that she believed Trooper Cartwright was lying when he denied

hitting Coker after he was handcuffed.

On November 10, 2009, after that same day being administered the polygraph

examination, Trooper Cartwright met with Major Cleve Barfield, Major Ed Wolfe, and

Major Les Braunns, individuals on the ASP's Command Staff Review Board that would

review Coker's complaint, and Lieutenant Colonel Tim K'Nuckles, the person to whom

the Command Staff Review Board would report its findings.  Also in the room was

Corporal Ward.  According to Trooper Cartwright, Lieutenant Colonel K'Nuckles, if not

others, believed he was lying about not striking Coker after he was handcuffed and that

they were considering firing him.

On November 17, 2009, Corporal Ward generated an Investigative Summary of

the investigation of Coker's allegations against Trooper Cartwright.  Corporal Ward set

forth the ASP Policies and Procedures that were alleged to have been violated by Trooper

Cartwright and basically recounted Coker's and Trooper Cartwright's version of the

events surrounding Coker's arrest, the interviews to which Trooper Cartwright was

subjected, and the results of the polygraph examinations.  Corporal Ward additionally

noted that it was documented on Coker's book-in medical information sheet and

photograph from the Sherwood Police Department that Coker's "medical problems were a

broken sinus cavity, broken eye socket and migraines," and "[t]he photograph clearly

shows a dark purple mark under [Coker's] left eye, a red bruise on his left cheek and

swelling of the left cheek."  Corporal Ward states that the medical bills provided by

Coker totaled $5,921.07.

On December 10, 2009, the Command Staff Review Board convened to address

Coker's complaint of excessive force.  The Review Board interviewed Corporal Ward

and Trooper Cartwright, among others.  Corporal Ward does not recall specifically telling

the Command Staff Review Board during her interview that Trooper Cartwright was

found to be deceptive after the polygraph examination and that he, according to Coker, at

one point admitted hitting Coker with the flashlight.  Corporal Ward did, however, note

that the polygraph results and Trooper Cartwright's statements regarding the flashlight

were in the Command Staff Review Board's file.

The Command Staff Review Board entered the following Finding of Facts:

After reviewing the investigative file, watching the in-car video compact
disc and interviewing witnesses, the CSRB arrived at the following
conclusion:

The Use of Force policy violations stated in this Internal Affairs
investigation have been unfounded.  A review of the video tape indicated
the bump of the motorcycle was at a slow speed and caused the motorcycle
to lay over on its side.  The driver was not injured as a result of this action.
This action was not a PIT [Precision Immobilization Technique[5]] maneuver.

---

[5] The ASP Policy as it relates to Pursuits and Intentional Intervention describes the PIT as
"a forced rotational vehicle stop of a suspect vehicle in an effort to end the suspect's flight."  The
ASP policy states that "[d]ue to the configuration of the Dodge Charger, PIT should not be used
except when it is objectively reasonable to protect an officer or third person from imminent
death, serious physical injury, or an armed or dangerous fleeing felon," and that "[e]xcept when

The action prevented the cyclist from fleeing into on-coming traffic which could have resulted in a catastrophic collision.

The Internal Affairs file as presented to the Command Staff Review Board gives no proven indication that excessive use of force violations have been committed.  Trooper Cartwright did use force by the means of a kick to the facial area as well as a punch, but the board sees this force as necessary to control Mr. Coker and affect the arrest.  There is no solid evidence to substantiate the allegations of excessive force.

The Use of Force form was improperly completed.  The Scenario depicted in the report was incomplete and vague.  More detail needed to be written in the narrative.

After entering its Findings of Fact, the Command Staff Review Board issued the

following recommendations:

The Command Staff Review Board recommends that the Troop A supervisory personnel review all reporting documents to ensure they contain a complete narrative that is understandable, relevant to the situation, and the language is concise and clear and depicts the entire description of the event as it transpired.  Other than training in report writing, the board recommends that no disciplinary action be taken against Trooper Brad Cartwright.

The Command Staff Review Board's findings of fact and recommendations were

sent to Lieutenant Colonel Tim K'Nuckles, who apparently did not alter the findings of

fact and recommendations.

II.

---

it is objectively reasonable to protect an officer or a third person from imminent death or serious physical injury, PIT should not be utilized on trucks carrying hazardous materials, pick-up trucks with passengers in the bed of the truck, vans or buses occupied with passengers who appear to be victims, or motorcycles."

The Court first addresses Coker's motion to compel discovery. Coker states that on June 15, 2012, he served upon Trooper Cartwright a set of interrogatories and request for production of documents in which he requested, *inter alia*, certain internal affairs and personnel files for Trooper Cartwright and a video of the polygraph exam given to Trooper Cartwright in the internal affairs investigation of Trooper Cartwright's arrest of Coker. Coker claims this discovery is still outstanding. Defendants, however, have responded to Coker's motion to compel stating, *inter alia*, that although they believe they provided all documents requested, they have now supplemented the responses that Coker said were incomplete or the information does not exist, namely there is no video of Trooper Cartwright's polygraph exam. Coker has not contested these assertions and he has since filed his response to Defendants' motion for summary judgment and does not mention his motion to compel or claim that he is unable to adequately respond to Defendants' motion for summary judgment because of outstanding discovery. It appears that Coker's motion to compel is now moot and the Court accordingly denies Coker's motion to compel on that basis.

III.

The Court now turns to Defendants' motion for summary judgment. Defendants move for summary judgment on the following grounds: (1) the ASP and Trooper Cartwright in his official capacity are not subject to suit under § 1983 and are entitled to sovereign immunity; (2) Coker cannot establish the required elements of an excessive force claim against Trooper Cartwright; and (3) Trooper Cartwright is entitled to qualified

immunity.  Defendants argue there are no genuine issues of material fact with respect to

any of these issues and that they are entitled to summary judgment as a matter of law.

A.

Summary judgment is appropriate when "the pleadings, the discovery and

disclosure materials on file, and any affidavits show that there is no genuine issue as to

any material fact and that the movant is entitled to a judgment as a matter of law."

Fed.R.Civ.P. 56(c).  The moving party "bears the initial responsibility of informing the

district court of the basis for its motion," and must identify "those portions of [the record]

... which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party has properly

supported its motion for summary judgment, the nonmoving party must "do more than

simply show there is some metaphysical doubt as to the material facts."  *Matsushita Elec.*

*Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986).  The nonmoving party must

respond by submitting evidentiary materials that set out "'specific facts showing ... a

genuine issue for trial.'"  *Celotex*, 477 U.S. at 324 (quoting Fed.R.Civ.P. 56(e)).  The

inferences to be drawn from the underlying facts must be viewed in the light most

favorable to the party opposing the motion.  *Matsushita,* 475 U.S. at 587 (citations

omitted).  Credibility determinations, the weighing of the evidence, and the drawing of

legitimate inferences from the facts are jury functions, not those of a judge.  *Reeves v.*

*Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citation and quotation marks

omitted).  However, "[w]here the record taken as a whole could not lead a rational trier of

fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

### B.

### 1.

The Court first addresses Defendants' claim that the ASP and Trooper Cartwright in his official capacity are not subject to suit under § 1983 and are entitled to sovereign immunity. The sovereign immunity enjoyed by states and recognized in the Eleventh Amendment bars private parties from bringing actions for damages against unconsenting states in federal courts. *Thomas v. St. Louis Bd. of Police Com'rs*, 447 F.3d 1082, 1084 (8th Cir. 2006) (citation omitted).[6] A suit against state employees in their official capacities is the functional equivalent of a suit against the State. *Zajrael v. Harmon*, 677 F.3d 353, 355 (8th Cir. 2012) (citations omitted). Section 1983 provides no cause of action against agents of the State acting in their official capacities, see *id.*, with the exception of claims for prospective injunctive relief. *Monroe v. Arkansas State University,* 495 F.3d 591, 594 (8th Cir. 2007).

---

[6] The State of Arkansas has not waived its immunity, nor did Congress abrogate that immunity when it enacted § 1983. *McCoy v. Carter-Jones Timber Co.*, 352 Fed.Appx. 119, 121 (8th Cir. 2009) (citation omitted). See also *Quern v. Jordan*, 440 U.S. 332, 345 (1979) (42 U.S.C. § 1983 does not abrogate a state's Eleventh Amendment immunity).

Coker states in his complaint that he would "like an injunction" to keep Trooper Cartwright from using the type of force that was used against him "before he does kill someone" and he is also requesting that ASP Policy "be revisited as it appears to condone running over motorcycles, cars, or people when state police are in pursuit of vehicles on the road for non-violent offenses."  In his response to Defendants' motion for summary judgment, Coker states there are genuine issues of material fact with respect to whether he is entitled to prospective injunctive relief as it relates to Trooper Cartwright in his official capacity.  He states he seeks to have the Court terminate Trooper Cartwright's position with the ASP "so he is never in the position to apply excessive force on Coker or anyone else in the future," that he seeks to have the Court enjoin the ASP from investigating their own employees as it relates to use of force and put in place an independent body to oversee use of force by the ASP, and that he seeks to have the Court oversee the way use of force is handled within the ASP and require education, training and other methods to ensure compliance with the laws as they relate to force used against citizens.

It is fundamental that when the underlying conduct does not deprive a plaintiff of a federally protected right, an attendant §1983 claim against a state employee in his official capacity based on that underlying conduct must fail.  *Cf. Olinger v. Larson*, 134 F.3d 1362, 1367 (8th Cir. 1998) ("In light of our ruling that Detective Larson and Chief Satterlee did not violate Olinger's fourth amendment rights, Olinger's claims against the City . . . must also fail.").  As will be seen, the Court determines that Trooper

-20-

Cartwright's use and amount of force against Coker was objectively reasonable, that

Coker has not created genuine issues of material fact regarding the application of ASP

policy and procedures to the actions of which he complains, and that Trooper Cartwright

is entitled to qualified immunity.  Coker thus is not entitled to any prospective injunctive

relief and Coker's § 1983 claims against the ASP and Trooper Cartwright in his official

capacity are accordingly barred under the doctrine of sovereign immunity.  See, *e.g.*,

*Gleghorn v. Melton*, Civil No. 04-6060, 2007 WL 1321838, at *2 (W.D. Ark. May 04,

2007) (sovereign immunity bars § 1983 and § 1985 claims against the ASP, the ASP

Director, and the ASP Commission Chairman in their official capacities).

2.

The Court now turns to Coker's excessive force claim against Trooper Cartwright

in his individual capacity.  Coker claims Trooper Cartwright used unjustified deadly force

against him and argues that there are genuine issues of fact about whether Trooper

Cartwright's use of force was objectively reasonable and whether Trooper Cartwright is

entitled to qualified immunity.

Coker's claim of excessive force is governed by the Fourth Amendment's

prohibition against unreasonable seizures.  *Loch v. City of Litchfield*, 689 F.3d 961, 965

(8th Cir. 2012) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)).  "The

reasonableness of a use of force turns on whether the officer's actions were objectively

reasonable in light of the facts and circumstances confronting him, without regard to his

subjective intent or motivation."  *Id.*  The Court "must consider the totality of the

circumstances, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether the suspect is actively fleeing or resisting arrest." *Id.* The use of deadly force is reasonable where an officer has probable cause to believe that a suspect poses a threat of serious physical harm to the officer or others. *Id.* (citing *Tennessee v. Garner,* 471 U.S. 1, 11 (1985)). The Court "must judge the reasonableness of the force 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight,'" and the Court "must make 'allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'" *McKenney v. Harrison*, 635 F.3d 354, 360 (8th Cir. 2011) (quoting *Graham,* 490 U.S. at 396–97).

"Qualified immunity shields a government official from liability and the burdens of litigation unless his conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Loch*, 689 F.3d at 965 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). "An official is entitled to qualified immunity unless (1) the evidence, viewed in the light most favorable to the plaintiff, establishes a violation of a constitutional or statutory right, and (2) the right was clearly established at the time of the violation." *Id.* (citing *Pearson v. Callahan,* 555 U.S. 223, 232 (2009)).

The Court has carefully considered the matter and concludes on this record that Trooper Cartwright's use and amount of force against Coker was objectively reasonable.

Coker was racing his untagged motorcycle on a highway at speeds exceeding 150 mph and Coker's actions in fleeing at such high speeds and his manner in crossing the opposite highway created a serious threat of immediate danger to those also traveling on the highway at that time.  Trooper Cartwright had no idea of Coker's motive for fleeing or whether he was armed and dangerous, and Coker demonstrated from the outset an intent not to cooperate with Trooper Cartwright's traffic stop.  When Trooper Cartwright's patrol car bumped Coker's motorcycle a second time, Coker fell of his motorcycle and immediately jumped up and began running in a clear attempt to flee.  Coker was wearing bulky clothing and Trooper Cartwright, not knowing if Coker had a weapon on him, states he took Coker to the ground with a kick to the face after Coker assumed an aggressive fighting stance and that he struck him once more in the face while possibly holding his flashlight when Coker was struggling with him (as evidenced by the screaming and yelling heard on the video, including Trooper Cartwright yelling for Coker to put his hands behind his back).  Coker disputes he assumed a fighting stance but he acknowledges he "threw [his] helmet off" and "kept turning a circle," movements that could reasonably be construed in the low light as hostile.  Even if Trooper Cartwright was mistaken about Coker's intentions, "[a]n act taken based on a mistaken perception or belief, if objectively reasonable, does not violate the Fourth Amendment."  *Loch*, 689 F.3d at 966 (citation omitted).[7]

---

[7] As previously noted, the Command Staff Review Board determined that Trooper Cartwright did not violate ASP policy and procedure regarding the pursuit of Coker, the stop of him, and the use of force in effecting his arrest, and Coker has not created genuine issues of

In his complaint, Coker alleges, *inter alia*, that Trooper Cartwright ordered him to get on the ground on his face, which he states he did, but that Trooper Cartwright approached him and kicked him in the head.  Coker also alleges that after Trooper Cartwright cuffed his wrists, Trooper Cartwright struck the left side of his face with his flashlight and struck him "in the face again before walking to his car."[8]

The Court does not find that Coker has created with these allegations genuine issues of material fact for trial on his excessive force claim.  First, the kick to Coker's head occurred prior to Coker being cuffed and secured and it is clear from the audio portion of the video of Coker's pursuit and arrest that there was some sort of a struggle taking place.[9]  The kick to the head as alleged by Coker certainly does not appear to have been significant as Coker states he "didn't really feel pain from it" and he claims the injuries to his face were not from any kick but from Trooper Cartwright's flashlight.  Given the tense, uncertain, and rapidly evolving circumstances of attempting to secure Coker after he had attempted to flee, the force used by Trooper Cartwright by way of the kick was objectively reasonable.

---

material fact regarding the Command Staff Review Board's determination.

[8] Coker's complaint is signed and dated as true under penalty of perjury and, thus, is the equivalent of an affidavit for summary judgment purposes.  See *Roberson v. Hayti Police Dep't,* 241 F.3d 992, 994-95 (8th Cir. 2001) (a plaintiff's verified complaint is the equivalent of an affidavit for summary judgment purposes, and a complaint signed and dated as true under penalty of perjury satisfies the requirements of a verified complaint under 28 U.S.C. § 1746).

[9] Coker and Defendants reference only one kick, with Coker stating that he was kicked while on the ground, while Trooper Cartwright states he used a kick to put Coker on the ground.

Likewise, Trooper Cartwright's strike to Coker's face while possibly holding his flashlight took place, according to Coker's deposition testimony, prior to Coker being fully cuffed and secured.  In this respect, Coker states in his deposition that only one arm was cuffed and that when he turned his wrist

> to start going behind my back, I realized that I wouldn't be able – from laying down flat on the ground, I wasn't going to be able to just turn my hand and go behind my back.  And I got it ready to where I could just roll a little bit to my right and then I could get my arm behind my back. And when I did, I looked out the corner of my eye, it's crazy, but I seen his red hair and his freckles and I seen a flash, then I heard the batteries hit the side of the MAG light and then I heard the bones in my face break.

Although Coker states in his complaint that Trooper Cartwright struck him with the flashlight after his wrists were cuffed, Coker cannot create genuine issues of material fact between his own deposition and complaint to defeat summary judgment.  Coker's admission  that he was maneuvering his arm to "roll a little bit to [his] right" constitutes on this record a reasonably objective basis, even if mistaken, for Trooper Cartwright to conclude that Coker was resisting being cuffed.  Trooper Cartwright may have had his flashlight in his hand when he struck Coker's face while attempting to cuff him (and for purposes of today's decision, the Court assumes he did) but in the tense, uncertain, and rapidly evolving circumstances of attempting to secure Coker after he had attempted to flee, the force used by Trooper Cartwright by way of his strike to Coker's face while attempting to cuff him was objectively reasonable.

Finally, Coker alleges in his complaint that Trooper Cartwright struck him "in the face again before walking to his car" but the circumstances surrounding this alleged strike

-25-

as described by Coker are ambiguous.  In his deposition, Coker was asked if Trooper Cartwright struck him while he was standing up to which Coker answered (in contrast to his complaint), "When we were walking back to the car."  He also characterized this strike in his deposition as an elbow to the face about halfway to Trooper Cartwright's patrol car (although he does not characterize this strike as an elbow to the face in his complaint or summary judgment papers).   Coker, then, describes the lone strike following the strike with the flashlight in at least two seemingly different ways: he alleges in his complaint a strike to his face before walking to the patrol car and he alleges in his deposition an elbow to his face about halfway to the patrol car.[10]  Certainly, Coker has not created with his own ambiguities genuine issues of material fact for trial and he does not describe the severity of the alleged strike/elbow or if he was injured from the alleged strike/elbow.  Considering the totality of the circumstances, the Court does not find on this record that Coker has created with this allegation genuine issues of material fact for trial on his excessive force claim.

The unidentified sound in the video of Coker's pursuit and arrest that occurred when Trooper Cartwright was ordering Coker to get up does not alter the Court's conclusion.  In his brief in support of his response to defendants' motion for summary judgment, Coker claims that the alleged strike delivered by Trooper Cartwright after he was cuffed is "corroborated with the 'thump' sound you hear on the pursuit video...."  In

---

[10] These two descriptions of the lone strike following the strike with the flashlight are clearly referencing the same strike as Coker is alleging he was struck three times by Trooper Cartwright–the kick, the strike with the flashlight, and the strike after he was cuffed.

this respect, Coker is claiming that the "thump" sound is the alleged elbow to his face as he cites to the portion of his deposition where he is discussing the elbow.  But it is obvious from the audio portion of the video of Coker's pursuit and arrest that the "thump" sound occurred while Coker was still on the ground whereas Coker claims the alleged elbow to his face occurred about halfway to Trooper Cartwright's patrol car.  Coker does not address this contradiction.  Certainly, one might reasonably be concerned by the nature of the sound, occurring as it did when Trooper Cartwright for the second time was ordering Coker to get up followed by Coker pleading for Trooper Cartwright to not hit him again.  But the sound could also have originated from an innocuous source.  There simply is no way of knowing and Coker's contradictory assertions about when he was struck or elbowed only further confuse matters.  While the Court shares the concerns of the ASP investigators about the nature of Coker's injuries and what transpired between Coker and Trooper Cartwright that February morning, it would be speculation to conclude that the sound in the video was Trooper Cartwright striking or elbowing Coker after he was cuffed.  "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment."  *Yarborough v. DeVilbiss Air Power, Inc.*, 321 F.3d 728, 730 (8th Cir. 2003) (citation omitted).

3.

The Court addresses two other evidentiary issues that Coker argues precludes summary judgment.  First, Coker points to the fact that Corporal Ward determined that deception was indicated on Trooper Cartwright's polygraph examination and argues that

the results of Trooper Cartwright's polygraph examination thus undermine his version of what transpired.  The Court determines, however, that "[b]ecause 'there is simply no consensus that polygraph evidence is reliable,'" *United States v. Scheffer*, 523 U.S. 303, 309 (1998)), the polygraph evidence Coker relies upon is of no value to the Court in ruling on Defendants' motion for summary judgment.  Cf. *United States v. Gill*, 513 F.3d 836, 846 (8th Cir. 2008) (because there is no consensus that polygraph evidence is reliable, the polygraph evidence proffered by defendants would have been of little or no value to the district court in ruling on defendants' motion to suppress); *Davis v. Oyster-Bay East Norwich Central Sch. Dist.*, No. 09-cv-1823, 2010 WL 3855237, at *6 (E.D.N.Y. Sept. 28, 2010) (polygraph results generally are inadmissible to defeat summary judgment); *Price v. Washington*, No. 3:10-cv-2202-L, 2012 WL 2324501, at *3 (N.D. Tex. June 19, 2012) (court noted that most, if not all, of the information regarding polygraph examination was inadmissible, and the court did not rely on it in reaching its decision on motion for summary judgment).

Coker has also submitted for the Court's review a video of a traffic stop that Trooper Cartwright conducted on one Leadrey Cobbs and suggests that this video demonstrates a propensity on the part of Trooper Cartwright to use excessive force.  The video shows that after Trooper Cartwright pulled Cobbs over for a traffic violation, he informed Cobbs that her vehicle would have to be towed because her driver's license was suspended.  Cobbs attempted to explain to Trooper Cartwright that she had insurance on her vehicle and that the law allowed her fiancé, who was on his way to the scene, to take

possession of her vehicle for her.  When Trooper Cartwright disagreed, Cobbs essentially said to Trooper Cartwright that he would probably tow the vehicle notwithstanding the law because he has his way "with all kinds of stuff."  Trooper Cartwright asked Cobbs if she was implying that he was "being crooked" to which Cobbs replied that she wasn't trying to argue with him.  Cobbs, however, continued to question the reasons for her vehicle being towed and Trooper Cartwright told her not to tell him what the law is and how to do his job.  Cobbs was talking on her cell phone at the time and Trooper Cartwright told her that if it was her friend (or fiancé) to whom she was talking, to instruct that person to not get out of their vehicle and to leave the scene or they would wind up going to jail.  Cobbs so instructed whomever she was talking to and then began to walk back to her vehicle (or to the vehicle containing her fiancé) while taking on her cell phone.  Trooper Cartwright followed Cobbs, telling her to "come here," took her by her wrist, and attempted to lead her back away from her vehicle, warning her she was about to end up going to jail.  Cobbs became agitated, telling Trooper Cartwright to take his hands off her.  When Cobbs began to struggle with Trooper Cartwright and was screaming and yelling expletives, Trooper Cartwright took her to the ground and cuffed her as she continued to struggle.  Trooper Cartwright assisted Cobbs in standing up but she continued to struggle and he took her to the ground again.  When Cobbs would not calm down, Trooper Cartwright warned her that she was "fixing to get sprayed."  Cobbs continued to struggle on the ground and Trooper Cartwright pepper-sprayed her.  Trooper

Cartwright later commented to fellow troopers who had arrived on the scene that Cobbs wasn't going to tell him how to do his job.

The Command Staff Review Board examined Trooper Cartwright's actions during the Cobbs traffic stop and concluded that although Trooper Cartwright did not violate any policies, his "use of OC spray may have been questionable since the suspect was handcuffed and on the ground."  But even so, the circumstances confronting Trooper Cartwright in the respective traffic stops of Coker and Cobbs were vastly different and the Court finds that Trooper Cartwright's actions during the Cobbs traffic stop, including his questionable use of pepper-spray on Cobbs, simply do not shed light on the issues surrounding Coker's arrest.[11]

4.

In sum, judging the reasonableness of the force 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight,'" and "mak[ing] 'allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation,'" *McKenney*, 635 F.3d at 360, the Court concludes on this record that Trooper Cartwright's use and amount of force against Coker was objectively reasonable under the

---

[11] Even if Trooper Cartwright could have been less piqued about Cobbs questioning his reasons for towing her vehicle and perhaps diffused the situation before it deteriorated, Cobbs was being obstinate and had no basis for reacting the way she did when Trooper Cartwright attempted to lead her back away from her vehicle after she had walked away from him.

circumstances and did not violate Coker's clearly established constitutional rights.

Trooper Cartwright is accordingly entitled to qualified immunity against Coker's

excessive force claim.

IV.

For the foregoing reasons, the Court grants Defendants' motion for summary

judgment [doc.#29] and denies Coker's motion to compel discovery [doc.#35] as moot.

Judgment will be entered accordingly.

IT IS SO ORDERED this 12th day of October 2012.

/s/Susan Webber Wright
UNITED STATES DISTRICT JUDGE